THE ACQUACKANONK WATER COMPANY and others, appellants,

and

JOHN WATSON, respondent.

Upon the application of the owner of a brook, used by him for nine years for the purposes of a bleachery, adjacent owners higher up the stream were enjoined from abstracting water therefrom, for the public purpose of supplying a village, and substituting water of an inferior quality taken from a canal,—*Held,*

(1) That the inferior importance and limited use by the complainant would not justify such appropriation by the defendants.

(2) That the actual mode and extent of complainant's use was not known to defendants, cannot divest or impair his right to have the stream run in its natural condition and course.

(3) That the silence of complainant during the erection of the water-works constitutes no equitable estoppel, because he had a right to presume that defendants' use of the stream would not exceed its legitimate use.

(4) That the erection of a dam by defendants is not shown to diminish the flow of water or to corrupt its quality, by reason of the water standing in the pond, to an extent sufficient to justify its removal.

*Mr. T. D. Hoxey,* for appellants.

*Mr. T. M. Moore,* for respondent.

This cause was argued before the Hon. Amzi Dodd, as special master, at October Term, 1876, and from the following opinion, delivered by him, the appeal was taken.

Acquackanonk Water Co. *v.* Watson.

THE MASTER.

The controversy in this case relates to a stream called Weasel brook, in the village and county of Passaic. The complainant, John Watson, has been the owner, since 1869, of lands crossed by this brook, and has carried on there a factory or mill for the bleaching of goods. Next above on the stream, and adjoining Watson's lands on the north, are the premises of the defendants " The Acquackanonk Water Company," who, in or about the fall of 1871, began, and in or about May, 1872, completed, their works on their premises, for the purpose of supplying the village of Passaic with water. The Dundee canal, whose waters are drawn from the Passaic river, is at this place quite near to and runs in the same general course as the brook. The company's works were a dam built across the stream, for the collection of a body of water, and an engine or pump-house to raise the water so collected into a distributing reservoir above. The pump-house, situated below the dam and eight or nine hundred feet above the bleachery, was built upon the strip of land between the canal and the brook, and was intended to be driven by water drawn from the former and discharged into the latter; the level of the canal being considerably higher than the level of the brook. On the 30th of May, 1872, the complainant exhibited his bill setting forth his ownership of the bleachery and lands, and his rights in the water of the stream, alleging that it was necessary, for the purpose of successfully or profitably carrying on the business of his bleachery, to have pure, clear water to use in the process of bleaching; that the brook was a natural water-course, remarkably well adapted to the use of his bleachery, and that it had been so used for the previous nine years; that the diversion of the pure spring waters of the brook, and the letting into its channel of the mixed or impure waters of the canal, would deprive him of the water necessary for his bleachery, and render his factory, then worth over $75,000, comparatively valueless; that the defendants had procured from him no consent to their pro-

posed diversion and contamination of the brook, but had been notified to the contrary. The bill asked for an injunction, and that the dam might be decreed to be reduced. On the filing of the bill an injunction was allowed by the late chancellor restraining the defendants as follows: From diverting any of the waters of the Weasel brook from the lands of the said Watson, and from pumping the water of said brook out of the stream thereof before it reaches the lands of said Watson, for the purpose of diverting it from his lands, or for any other purpose whatever which would interfere with the natural flow of the water in said stream through said Watson's lands, and from doing all acts and things whereby the waters of said brook may be prevented from flowing in their natural state and condition and in their natural channel in and through his lands, and from discharging any waters from the Dundee canal or the Passaic river into said brook, and from mixing any other waters with the waters of said brook than those which naturally have been accustomed to run in the bed of the stream thereof.

The injunction so issued has ever since continued to be in force. The water company have conformed to it without suspending their operations. The water of the brook has been used to drive the wheel of the pump-house and then returned to the brook, while the water of the Dundee canal has been pumped into the reservoir for the supply of the village, thus reversing or exchanging the courses originally intended.

The defences set up in the answer are:

First—That the complainant did not own the full fee of the bleachery premises, inasmuch as a widow's right of dower existed therein, and that she had given a license to the company to use their works as constructed.

Second—That the complainant did not, in fact, use the water of the brook for his bleachery, as alleged in his bill, but that he used the waters of the Dundee canal, and also the waters of a spring on his premises.

Acquackanonk Water Co. *v.* Watson.

Third—That the brook waters were not pure spring waters, as claimed in the bill, and that the canal waters were, in fact, as pure and good for bleaching purposes as those of the brook.

Fourth—That the complainant is equitably estopped from relief in this court by his conduct in standing by and seeing the works built at great cost, for useful public purposes, by an incorporated company, without remonstrance or warning on his part.

Fifth—That the water company had constructed their works through the representations and covenants of their grantor, in error or ignorance of complainant's rights, and without knowledge that he had rights which could be injured by their works. That the injury, in fact, to the complainant, by the proposed use of the works, would be remote and trivial, and that the prevention of such use would make their works measurably valueless.

The testimony in the case is exceedingly voluminous, filling nearly five hundred printed pages. I have given much time and attention to the examination of it in connection with the very full and able briefs of the counsel on both sides, and the conclusion I have reached is, that the complainant is entitled to have the injunction, substantially as issued, decreed to be perpetual, with the costs of his suit, but that no directions should now be made looking to a reduction of the dam. Further application, if necessary, in regard to it may be made under leave reserved for that purpose.

This conclusion is required, I think, under the facts of the case, by the elementary and established principles of law relating to the use of running waters and to the subject of equitable estoppel. Chancellor Kent, in his *Commentaries* (Vol. III, § 52), lays down these principles as to the former. Every proprietor of lands, he says, on the banks of a river, has naturally an equal right to the use of the water which flows in the stream adjacent to his lands, as it was wont to run, without diminution or alteration. No proprietor has a right to use the water to the prejudice of other proprietors

24

above or below him, unless he has a prior right to divert it or a title to some exclusive enjoyment. He has no property in the water itself, but a simple usufruct while it passes along. *Aqua currit et debet currere ut currere solebat,* is the language of the law. Though he may use the water while it runs over his land, as an incident to the land, he cannot unreasonably detain it or give it another direction, and he must return it to its ordinary channel when it leaves his estate; without the consent of the adjoining proprietors he cannot divert or diminish the quantity of water which would otherwise descend to the proprietors below, nor throw the water back upon the proprietors above, without a grant or an uninterrupted enjoyment of twenty years, which is evidence of it. The owner must so use and apply the water as to work no material injury or annoyance to his neighbor below him, who has an equal right to the subsequent use of the same water. Streams of water are intended for the use and comfort of man, and it would be unreasonable and contrary to the universal sense of mankind to debar every riparian proprietor from the application of the water to domestic, agricultural and manufacturing purposes, provided the use of it be made under the limitations which have been mentioned, and there will no doubt inevitably be, in the exercise of a perfect right to the use of the water, some evaporation and decrease of it, and some variations in the weight and velocity of the current. But *de minimis non curat lex*, and a right of action by the proprietor below would not necessarily flow from such consequences, but would depend upon the nature and extent of the complaint or injury, and the manner of using the water. All that the law requires of the party by or over whose land a stream passes is, that he should use the water in a reasonable manner, and so as not to destroy or render useless, or materially diminish or affect the application of the water by the proprietors above or below on the stream.

The number of adjudged cases, involving the rights of contending proprietors, to be found in the reports, is very

large, and many of them have been referred to by counsel, but I do not find anything in conflict with the statement of the law as above made by Chancellor Kent.

The difficulties presented by the cases grow out of the application of the rules so enumerated, and not in regard to the rules themselves. In the present case I am convinced by the evidence that the stream is, in the legal sense, a natural water-course; that the water in it being mainly, if not entirely, spring water, and more than usually pure and clear, is peculiarly well fitted to the purposes of bleaching; that the complainant, ever since 1869, has been the owner of the factory premises over which the stream passes, and that he has made use of it to an important extent in his bleachery; that the water in it is more valuable to him in its native and customary state than it would be if mixed with the water of the canal, or than the water of the canal would be if substituted for it, as the company originally designed; that the premises of the complainant, and the adjoining premises of the company, were previously the property of one owner, and from him came by grants, first to the complainant and afterwards to the company, the latter taking with constructive and actual notice of the complainant's ownership and rights in the stream. It is insisted upon in the answer, and was strongly urged in the argument, that the complainant's allegation that he drew water for bleaching purposes from the stream was untrue, and that the pipe through which the water is testified by the complainant's witnesses to have been drawn, did not, in fact, exist, or was not, in fact, so used. But I cannot doubt that the defendants are in error on this question of fact. The proof is too explicit, and the use too probable, in itself considered, to permit me to doubt that the water was so used. In this state of things I am unable to see, under the settled principles of law above cited, how the company could, with any color of right, without the consent of the complainant, divert the stream, or a large part of it, and discharge into it the water of the canal. No right to do so can be contended

for because the company was incorporated for the beneficial purpose of furnishing water to the village, or because the complainant's bleachery was of inferior importance or value, and the use made by him of the water comparatively limited. Regard is properly to be had to the character of the complainant's use, and its extent, in determining what is a reasonable detention or interference with the flow on the part of the proprietor above, but the circumstances of inferior importance and limited use cannot justify a general diversion or appropriation, such as the company claimed to be entitled to make. Nor can it be doubted that the complainant is entitled to preventive relief. Injuries of this kind are peculiarly within the jurisdiction of equity, and I am unable to see any sound reason why in this case the complainant, if apprised at the beginning of the company's works of their design to divert the native water and substitute water of a different quality and in fluctuating quantities, would not have been entitled to the aid of this court in preventing the evils resulting to him from such change, instead of being compelled to resort to a succession of actions at law. This view of the case, indeed, was not resisted by the company's counsel with the same strenuousness or confidence manifested in support of the defence that the complainant was estopped by his failure to remonstrate or object while the works were going on.

Upon the defence of estoppel, as upon the other branch of the defendant's case, the doubt or dispute does not arise as to the law, but as to the questions of fact—as to the knowledge of the complainant respecting the defendant's purposes and plans, and his acts or omissions, after such knowledge had been acquired. The legal principles asserted and relied on by the company's counsel, and which he has fully and learnedly exhibited in his brief upon the nature and operation of an equitable estoppel, are incontestably sound. It is one of the familiar maxims of equity that one who has been silent when in conscience he ought to have spoken, will not be permitted to speak when in conscience

he ought to be silent.   When silence becomes a fraud, he who. is led by it ignorantly or innocently to rest upon his title, believing it to be secure, and to expend money and make improvements upon his property, without the timely warning he should have had to dispel his illusion, will be protected by estoppel against the denial of his title.   But I am of opinion that the evidence in this case does not warrant the finding of fraudulent silence on the part of the complainant.   The testimony on this subject is mainly that of the parties themselves, and, while to some extent conflicting, may easily be reconciled with intentional truthfulness on both sides.

I shall not discuss or review it.   The result of it, in my judgment, is that there was a mutual misunderstanding, which would not have occurred but for the error of the company's officers as to the complainant's rights in the stream, an error mentioned in the answer, and which seems to have been one partly of law and partly of fact, but for which I am of opinion the complainant cannot be held responsible on the ground of concealment or of silence.   What is admitted to have taken place at the interview between the complainant and the company's president was sufficient to have put the latter upon inquiry, and is inconsistent, I think, with the view that any purpose existed in the complainant other than to stand upon his rights as a proprietor in the stream.   What such rights were, was matter of law.   The proprietorship itself was patent and known.   That the actual mode and extent of his use of the stream were not manifest cannot divest or impair his right to have it run in its natural condition or course.   The inference deducible from the open and visible construction of the works was not of an intention on the company's part to deprive the complainant of his property or rights, but to make a legitimate use of their own.   So far as the dam and other works could be made available for the company's purposes without unduly or essentially interfering with those which the complainant was entitled to exercise (and that to some valuable

Acquackanonk Water Co. *v.* Watson.

extent the works could be so available seems to be suffi-
ciently shown), the complainant had no right to object, and
was properly silent.   I think it would be greatly to over-
stretch and misapply the doctrine of equitable estoppel,
under the circumstances of this case, to hold that his legal
rights, as a proprietor and mill-owner on the stream, to the
use of the water, under the qualifications and in the man-
ner expressed in the language of Chancellor Kent, have
been lost or have become vested in whole or in part in the
proprietors above.   Yet this must, in my judgment, be held,
if the decree making the injunction perpetual, substantially
as issued, should now be denied.

But I cannot advise a decree requiring the dam to be
reduced.   Its height does not wholly or necessarily regulate
the flow of the stream as the complainant is entitled to have
it.   It is constructed on the company's land, and cannot be
a cause of complaint to the proprietor below, no matter how
high, if the flow of the brook be not unreasonably dimin-
ished or interrupted.   I do not see sufficient reason in the
alleged impurities of the water charged to be caused by the
standing water of the pond, to make it necessary or equi-
table to require the dam to be abated.   The acquiescence of
the complainant in the building of the dam was an acqui-
escence in the creation of the pond.   To some extent, per-
haps, the character of the water would be affected by being
held back, but I cannot consider this special effect of such
a kind or importance, under the circumstances of this case,
as to be a matter to be relieved against.

The controversy between the parties, so far as material
and substantial matters are involved, will be adequately dis-
posed of by the continuance of the injunction.

I will advise in accordance with the above.


PER CURIAM.

The decree, founded on the foregoing opinion, is unani-
mously affirmed, for the reasons therein expressed.