Beach v. Sterling Iron and Zinc Co.

---

ALFRED  E.  BEACH  and  THE  SPARKS'  MANUFACTURING
COMPANY

v.

THE STERLING IRON AND ZINC COMPANY.

1. To a bill by a riparian proprietor to restrain defendant from polluting (by discoloration) the stream, it is no defence or equitable excuse that the discoloration is the natural and necessary result of mining operations prosecuted in the ordinary way. The doctrine finally adopted in Pennsylvania, in the case of *Sanderson* v. *The Coal Co., 113 Pa. St. 126*, is not the law of this state.

2. Nor can the defendant set up that other independent causes are already operating to pollute.

3. The maintenance of a nuisance to real estate amounts to a taking of property and cannot be legalized by the legislature for private purposes, even

Beach v. Sterling Iron and Zinc Co.

upon terms of making compensation. Hence, where the right of the complainant is clear and the facts undisputed, a court of equity is bound to give preventive relief. To refuse it is to allow the defendant to take complainant's property upon terms of paying such compensation from time to time as a jury may assess.

4. In this case, the discoloration of the water coming from the mine shaft was caused by a fine clay found in a rent or fissure in the rock intersected by the shaft, and after continuing several months began to abate, so that defendant was able, by the use of a settling basin, to deliver it to the stream in a clear condition, and such was the situation of affairs at the final hearing, which commenced about six months after the bill was filed.—*Held*, that considering that defendant, by its answer, denied complainants' case throughout and set up a right to throw the discolored water into the river, and that the proofs show that there is some danger of the occurrence of discoloration in the future, that the decree establishing the complainants' rights should include a provision for a perpetual injunction.

Final hearing on bill, answers and proofs.

The object of this bill is to permanently restrain what is alleged to be a nuisance, namely, the pollution of a natural water-course. The complainant Beach is the owner, and the complainant manufacturing company is lessee in possession, of a paper mill, intended for making white tissue paper, situate on the Wallkill river, at Hamburg, in Sussex county, and driven by the waters of that river drawn out of an old artificial pond called the Furnace pond. The defendant is the owner of a mining property, situate near the river at a place called Greenspot, about a mile and a half upstream and southward from the paper mill.

The complaint is, that the defendant, in its mining operations, pumped out of its mine and discharged into the river, upstream from the complainants' mill, large quantities of turbid and discolored water, which affected the whole stream and rendered it unfit for use for making white tissue paper when it reached their mill.

The answer puts the complainants on proof of the allegations of their bill; alleges that the water of the river, as it flowed previous to its mining operations, was unfit for use for making white paper; that its unfitness was not materially increased by the con-

Beach v. Sterling Iron and Zinc Co.

tributions from its mine, and that it had a right to continue its mining operations, although the effect was to increase the discoloration of the water of the river.

The bill was filed on the 21st of April, 1893. On that day an order to show cause why an injunction should not issue, with an order for *interim* restraint "against corrupting or discoloring the water in the Wallkill creek, so as to prevent the complainant, the Sparks' Manufacturing Company, from carrying on its business of manufacturing white tissue paper in its accustomed manner," was made, returnable the 1st of May then next.

On the 25th of April, upon *ex parte* application and affidavits to the effect that the flow from the mine was discolored only for a short time at intervals, an order was made modifying the *interim* restraint embodied in the order of April 21st, as follows: "That if in the course of pumping from its mine the defendant shall pump discolored water, and shall immediately notify the persons in charge of the complainants' factory of such discoloration, before the discolored water shall reach the factory, in such case the restraining order shall be of no effect."

On the 1st of May, the hearing of the original order to show cause was postponed until the 15th of May, upon terms that the defendant give bond to secure the complainant against damages, and on the 15th of May, it was further postponed, and from time to time thereafter until the 28th of June, when an order was made that an injunction do issue restraining the defendant from corrupting or discoloring the water of the creek above the paper mill of complainant so as to damage complainant in its business of manufacturing white tissue paper in its customary manner, but that the operation of the injunction be suspended until the 17th of July next, in order to give the defendant an opportunity to provide for the disposition of its foul water or otherwise avoid the injury to the complainant complained of.

On the 17th of July, a motion was made to further extend the operation of the injunction, which was denied, and an injunction was issued according to the order of June 28th.

The cause was duly referred, and was heard by evidence on the 2d and 3d of November, the 27th and 28th of December,

1893, the 10th and 11th of April, 1894, and on the 2d of October, 1895.

*Mr. Theodore E. Dennis, Mr. Robert L. Lawrence* and *Mr. Thomas N. McCarter, Sr.,* for the complainants.

*Mr. Charles D. Thompson* and *Mr. Gilbert Collins,* for the defendant.

PITNEY, V. C.

The material facts of the case are undisputed. The only dispute is as to the degree of discoloration caused by the defendant's operations and the length of time over which such discoloration extended.

The facts clearly established are as follows:

The Wallkill river rises in the southern part of Sussex county and flows upon a course of nearly north, passing through the villages of Franklin and Hamburg. At the latter place is situated an artificial pond, called the Furnace pond, caused by an old dam, upon which, for several years, has been a paper mill driven by the waters of the river from that pond. The complainant Beach purchased this water-power and lands connected with it in the summer of 1891, for the purpose of erecting a plant for the manufacture of what is known as white tissue paper. Associated with him were two gentlemen by the name of Sparks, who had previously been engaged in the business of waxing white tissue paper according to a process which they controlled, and the project was to both manufacture and wax, for market, white tissue paper. For that purpose the corporation was formed, of which Mr. Beach and the Messrs. Sparks were stockholders, and the latter were the active managers. A large amount of money was spent in erecting a plant between the date of the purchase and the 1st of February, 1892, when they commenced the manufacture of white tissue paper and carried it on with success for about a year.

The manufacture of such paper requires a perfectly clear, pure water, and before purchasing the Hamburg water-power

the complainants inspected the stream and inquired as to its character for clearness, and satisfied themselves that they would be able to use it for making white tissue paper without incurring the expense of filtration, and their experience for a year proved that their expectations were just.

In the month of February, 1893, complaints began to come in from the purchasers of their paper that it was deteriorating in the matter of whiteness, and they investigated the cause. The pond was frozen over, but they knew by reputation that mining operations were being carried on at Greenspot by the defendant, and they went there (March 1st) and found a stream of highly-colored water flowing from the defendant's mine shaft into the river, traced its effect in discoloration to their pond, and by subsequent observations by themselves and others in the neighborhood traced its effect not only in and through the Furnace pond, but for miles down the river to the north of Hamburg. In fact, several respectable and credible witnesses, called by the complainants, testified to the discoloration of the water in the Furnace pond and beyond, and the complainants were stopped by the court from producing further evidence on that subject in the opening of their case. Several witnesses called by defendant, among them its superintendent, corroborated this evidence, and there is no attempt to meet it.

The color was a peculiar reddish-yellow tint, which was in marked contrast with the discoloration due to the ordinary road and field wash after a heavy storm or spring thaw.

This peculiar discoloration continued throughout the month of March, and, with some intermissions and variations in degree of discoloration, through the month of April. Complainants, early in March, were obliged to stop the making of white tissue paper. Negotiations between the parties for some arrangement of the matter failing, the bill was filed on the 21st of April, 1893.

The immediate origin of the discoloration was as follows: The defendant corporation was organized by two gentlemen by the name of Heckscher, and two by the name of Wetherill, for the purpose of reaching and working a bed of franklinite ore which had been located by boring exploration at a depth of

about a thousand feet below the surface near this point called Greenspot. It was the continuation of a seam of ore for many years worked to the southwest of Greenspot by two companies, one of which, viz., the Lehigh Zinc and Iron Company, was owned and controlled by the Heckschers and Wetherills. In the spring or early summer of 1891, the defendant commenced to sink a perpendicular shaft, known as the "Parker shaft," ten by twenty feet in diameter, and after passing through a small amount of superincumbent earth struck solid limestone rock. It continued the working without cessation until August 11th, 1892, when, having attained a depth of five hundred and sixty feet (many feet lower than the bed of the Wallkill), the workmen struck a water-bearing fissure or rent in the rock, which instantly flooded the mine and drove them out. Previous to that time they had encountered small seams or fissures from time to time, producing a little water and sometimes a little mud, which they pumped up of course, carried through a trough or trunk several hundred feet westerly toward the Wallkill till it reached a small spring run, where it was discharged, and from thence it ran into the Wallkill. The amount of water up to August was small, and its discoloration was slight, so that it was not felt or observed by complainants. The influx in August, 1892, was discolored by a fine clay, amounting almost to a pigment, having a high reddish-yellow tint, and intermixed with a small quantity of very fine sand. This water rose to within forty feet of the surface, and resisted all attempts to lower it by the pumps then in use, and until very large and heavy pumps were introduced. This was done in September. After the shaft filled with water there was no further movement—it became perfectly quiet—and the clay and sand began to settle, so that the water in the upper reach of the shaft became comparatively clear. The first water that was discharged after heavy pumping commenced came from near the top, and was but slightly discolored, such discoloration being due to the disturbance of the clay and sand which had settled on the timbering of the shaft. The quantity of water struck in the fissure was so great that with these powerful pumps very slow advance was made, the pumps

being lowered from time to time, and the greater the depth attained the less rapid the advance and the greater the discoloration.

On about 'the 1st of January, 1893, the water was reduced to a depth of four hundred and twenty feet from the surface, and a delay there occurred of about three weeks, caused by the necessity of establishing a pumping station at that point. When the rapid pumping commenced again, at or near the 1st of February, the discharge was much discolored, and continued growing worse and worse until the bottom was reached, and there, without detailing the circumstances, the greatest discoloration was reached, and continued during the month of March. The discoloring clay is so very fine in its texture that a very slight movement of particles of water with which it comes in contact will thoroughly mix it, and it will only subside in perfectly still water. This accounts for the fact that it did not fully subside in passing through complainants' pond, which is quite narrow, so that it is probable that the volume of the water of the Wallkill causes continued motion throughout its length.

After the shaft had been entirely pumped out and the volume of water stored in the fissure had been entirely exhausted and the flow reduced to the natural supply of the fissure, and the various water-channels which had been created throughout it by the sudden drawing off of the water had arrived at what the experts call an "angle of repose," so that no further scouring resulted from the flow of the ordinary quantity of water, there was no discoloration and the water ran clear. This condition was, as claimed by the defendant, reached some time in the summer of 1893, and the case shows that from about the middle of April or the 1st of May till about the middle of July, the discolorations were temporary and increasingly infrequent, and usually the result of clearing out the different settling basins, called sinks, which had been established in the rock at different points in the shaft. Since that time the shaft has been sunk over two hundred feet without finding any more water or fissures.

The proof is clear that the result of the contribution of this discolored water to the waters of the river was to render the mix-

ture when it reached complainants' mill unfit, without filtration, for use in making white paper.

An ingenious experiment was made by an expert, as follows: He ascertained, by a rough measurement, that the flow of the river was about forty times that of the output from the mine, and he took a jar of perfectly clear water and mixed with it one-fortieth of its quantity of the dirty water that came from the mine, and exhibited the sample to show to what a slight extent it was discolored. The dirty water which he used had been confined in a jar for several months, with the result that the fine particles of clay had partially coagulated and gathered into little flakes, and when shaken up did not produce the same degree of discoloration as exhibited when freshly taken from the running stream. But even that experiment showed that the result of so slight a mixture made the whole mass palpably roily. In point of fact, as shown by the evidence of the expert papermakers, a very small admixture of mud or clay will render the water improper, without filtration, for making white tissue paper; and the effect of that evidence is that the river, in its ordinary clear state, is no clearer than is necessary for that purpose. A very small admixture of coloring or dirty matter renders it unfit for use.

Several matters are urged in defence to this case. First, but faintly, that the doctrine finally established by a bare majority of a divided court in Pennsylvania, in *Sanderson* v. *The Coal Company, 86 Pa. St. 401, 94 Pa. St. 303, 102 Pa. St. 370,* and *113 Pa. St. 126,* should be adopted here. The history of that case, in its various phases, is given by a writer in the *American Law Register (N. S.), vol. 1, p. 1 (1894).* It was an action, as here, by a riparian proprietor against a mining company for polluting a natural stream with water pumped from its mine. After three decisions by the supreme court of Pennsylvania in favor of the plaintiff's right, that court finally held the contrary and affirmed the right of the coal company to discharge its acid mine water into the creek, without regard to its effect upon lands below, upon the broad ground that the necessities of the mining interests of the commonwealth required it. This result was attributed by the author of the article in the *American Law*

*Register* (*pp. 5, 18*), in part, to a lack of care on the part of the learned judge who prepared the first prevailing opinion. *86 Pa. St. 406.* The doctrine of that case is shown by that writer to be inharmonious with a long line of previous decisions in Pennsylvania, and has not been, so far as I can learn, followed in any other state—certainly not in this state. It was repudiated in Ohio, whose mining interests are quite large, in the recent and well-considered case of *The Columbus &c. Co.* v. *Tucker, 48 Ohio St. 41.* I refer particularly to the lucid expressions of the learned judge found on *pp. 58, 62.*

It was not suggested on the argument that the doctrine ever had the least foothold in this state. No case of a stream fouled by mining operations has indeed ever, so far as I know, been presented to our courts, but the right of a riparian proprietor to have the waters of the stream come to him unchanged in quality, as well as undiminished in quantity, has been determined in the clearest and most positive manner. In fact, the doctrine stated so tersely by Chancellor Kent, in *Gardiner* v. *Newburgh, 2 Johns. Ch. 162* (at *p. 166*)—"A right to a stream of water is as sacred as a right to the soil over which it flows. It is a part of the freehold"—has always been adhered to by our courts. I need refer only to *Holsman* v. *Boiling Spring Co., 1 McCart. 335*, and *Acquackanonk Water Co.* v. *Watson, 2 Stew. Eq. 366.* In the last case the right was stated by the learned master in an extremely clear and comprehensive manner, and the decree advised by him was unanimously affirmed on appeal, for the reasons by him given.

The facts of that case are, in a manner, analogous to those here under consideration. Watson owned and operated a bleachery which required for use clear and pure water, which he obtained from a small stream running through his land. The water company, desiring to supply the city of Passaic with potable water, proposed to take this small stream above the bleachery and substitute for it an equal or greater quantity of Passaic river water, drawn from the Dundee canal and used to drive its pumps. This the court restrained on the ground that the substituted water was not of equal purity with that abstracted.

There is a line of cases of pollution by mine water in England which sustains the general doctrine. *Hodgkinson* v. *Ennor, 4 Best & S. 229,* was the case, as here, of a papermaker against a miner who had permitted dirty washings of lead ores to run through rents called "swallets" in limestone rock into a subterraneous stream, rendering the water, which, in its course, came to plaintiff's paper mill, unfit for use in the manufacture of paper, and the action was sustained by Chief-Justice Cockburn and Justices Blackburn and Mellor.

*Magor* v. *Chadwick, 11 Ad. & E. 571,* was a suit by a brewer against a miner.

*Pennington* v. *The Brinsop Coal Co., L. R. 5 Ch. Div. 769 (1877),* was a suit by a manufacturer against a coal miner, where the only allegation of injury was, that the acid contributed to the water from the mine rendered it less fit for use in the engine boilers driving the machinery of the plaintiff's mill. An injunction was allowed. Defendant relied, without success, upon the ground taken in *Sanderson* v. *The Coal Co., supra,* that the acid could not be removed from the water; that there was no means of remedying the evil and an injunction would absolutely stop its work. The learned judge (Fry) refused even to exercise the right given by the English statute to give damages instead of an injunction, relying on *Clowes* v. *The Staffordshire Water Works, L. R. 8 Ch. App. 125 (1873),* and he declared that he would have granted the injunction, although the present damage was only nominal, because of the injury to the riparian rights of the plaintiff. And such is the doctrine of the case relied on, which was a suit by a silk-dyeing and washing establishment against a water works company for rendering the water coming to their works less clear and pure.

The English cases, dealing with pollution by mine water, culminated in the case of *Young* v. *Bankier, L. R. App. Cas. 691 (1893),* in the house of lords, on appeal from Scotland. The case was argued, elaborately, of course, before six law lords, whose unanimous judgments were delivered after consideration. The riparian proprietor (Bankier), the plaintiff there, was a distiller, and used the water of the stream in his distilling process,

presumably for making mash, for which it was peculiarly fit by reason of its softness.   The added mine water did not render it unfit for ordinary purposes—there called *primary* purposes—but by reason of its hardness rendered it less fit for distilling purposes.   *Sanderson* v. *The Coal Co.* was cited, but the court repudiated its doctrine and was unanimous in judgment in favor of the respondent, who was the plaintiff and had judgment below.   Lord Macnaghten (at *p. 699*) says : " Then the appellant urged (precisely as does the defendant here) that working coal was the natural and proper use of their mineral property. They said they could not continue to work unless they were permitted to discharge the water which accumulates in their mine, and they added that this water-course is the natural and proper channel to carry off the surplus water of the district.   All that may be very true; but in this country, at any rate, it is not permissible in such a case for a man to use his own property so as to injure the property of his neighbor."

There are numerous English cases upon the general right of a riparian proprietor to have the waters of his stream come to him in its natural condition, of which I cite *Crossley* v. *Lightowler,* *L. R. 3 Eq. Cas. 279 ; 2 Chan. App. 478 (1867)*; *Attorney-General* v. *Lunatic Asylum, L. R. 4 Ch. App. 145 (1868).* Numerous other cases will be found cited in *Gould Waters* § 219, and in *Higg. Pol. Waterc. 132 et seq.*

The argument was advanced by the defendant that the use of the defendant's property for mining purposes is what was termed, unfortunately, I think, by Lord Cairns, in *Fletcher* v. *Rylands, L. R. 3 H. L. 330* (at *pp. 338, 339*) *(1868),* a natural user, and similar in that respect to plowing a field, and that if it be unlawful for defendant here to cast into the stream the muddy waters from its mine, it is also unlawful for the farmer to plow his land and allow the muddy water which runs from it after a heavy rain to reach the river.   But the very statement of the two cases shows the absence of analogy between them.   In the first place, the water from the plowed field comes thereon by natural causes beyond the farmer's control, and runs by gravity to the stream ; while in the case of the mine·the water is, as here, found and raised

by artificial means from a level far below that of the river, and would never reach it but for the act of the miner. And, in the second place, by the common law of the land every owner may cultivate his land without regard to its effects upon his neighbor; while such is not the law as to mining. The supreme court of Ohio, in *Columbus Company* v. *Taylor, 48 Ohio 41* (at *p. 58*), repudiates the notion that mining was a natural use of land in the sense that farming is.

The ground of a reasonable natural user seems to be at the bottom of what was said in *Merrifield* v. *Worcester, 110 Mass. 216,* upon this topic. So far as the expressions there used favor the notion that a city or town may collect and discharge sewage matter into a fresh-water stream to the injury of a riparian owner without liability to action, they are contrary to the law as held in England for centuries. *Higg. Pol. Water 127 et seq.,* where several cases beside these above cited are collected.

Equally untenable is another position advanced by the defendant, viz., that the river was always more or less polluted by contributions from other mines and from the washing of plowed fields, public roads and railroad embankments. Such insistments have been frequently made and always overruled. The question in such cases seems to be whether the stream has already become so far polluted by contributors who have acquired a right so to do by adverse use or otherwise, as that the pollution presently opposed will not sensibly alter its condition. And even in such a case the courts have held that the party has the right to deal with each contributor in detail, and to buy off such contributors as have acquired a right, and is not obliged to submit to fresh contributors. I cite the following authorities: *Ross* v. *Butler, 4 C. E. Gr. 294* (at *p. 306*); *Attorney-General* v. *Steward, 5 C. E. Gr. 415* (at *p. 419*), where the learned chancellor says: "The defendants have no right to pollute or corrupt the waters of the creek, or if they are already partially polluted, to render them more so." And to *Cleveland* v. *The Gas Co., 5 C. E. Gr. 201* (at *p. 208*); *Meigs* v. *Lister, 8 C. E. Gr. 199* (at *p. 205*), where the learned chancellor says: "The position taken by counsel that the complainants were entitled to

no relief from this nuisance, because the locality was surrounded by other nuisances and dedicated to such purposes, has no foundation in law or in fact. If there were several nuisances of the like nature surrounding them, they must seek relief from each separately; they cannot be joined in one suit, nor need the suits proceed *pari passu.*"

*Crossley* v. *Lightowler, L. R. 2 Ch. App. 478* (at *p. 481*) (*1867*), where Lord Chelmsford says: "But the defendants contend that the plaintiffs have no right to complain of any pollution of the Hebble occasioned by them, because there are many other manufacturers who pour polluting matter into the stream above the plaintiffs' works, so that they never could have the water in a fit state for use, even if the defendants altogether ceased to foul it. The case of *St. Helen's Smelting Co.* v. *Tipping, 11 H. L. Ch. 642* (*11 Jur. N. S. 785*), is, however, an answer to this defence. Where there are many existing nuisances, either to the air or to water, it may be very difficult to trace to its source the injury occasioned by any one of them; but if the defendants add to the former foul state of the water, and yet are not to be responsible on account of its previous condition, this consequence would follow, that if the plaintiffs were to make terms with the other polluters of the stream so as to have water free from impurities produced by their works, the defendants might say, 'we began to foul the stream at a time when, as against you, it was lawful for us to do so, inasmuch as it was unfit for your use, and you cannot now, by getting rid of the existing pollutions from other sources, prevent our continuing to do what, at the time when we began, you had no right to object to.'" *Attorney-General* v. *Lunatic Asylum, 4 Ch. App. 145* (at *p. 150*), report of the expert, and *p. 155.*

*Attorney-General* v. *Leeds, L. R. 5 Ch. App. 583* (at *p. 595*) (*1870*), where the lord-chancellor says: "I think the argument deduced from the foul state of the water before it gets to Leeds is not deserving of any weight for two reasons. *First*—and it is hardly disputed—the evil did become seriously aggravated when the new sewer was opened—that is to say, sixteen or seventeen years ago; and *secondly*, the nuisance might terminate;

and no one can say it was right that when one nuisance terminates there should be another brought into existence."

The sensible and material increase in the discoloration of the water, in this case, resulting from the contribution of the defendant's mine, is clearly proved. The complainant was able to make white paper successfully and satisfactorily from February 1st, 1892, for nearly a year, and until the serious discharge of discolored water from the defendant's shaft, in January, 1893; and they were also able to make such paper after the discolored water ceased to run, in June or July, 1893. During the intermediate period, while the discoloration of the water being discharged from the defendant's mine was the greatest, complainant could not make white paper satisfactorily.

In whatever point of view the complainant's case is considered, it seems entirely clear and free from doubt. I cannot think the least doubt is cast upon the law by the last decision in the *Sanderson Case,* in Pennsylvania, and the facts of the case are substantially undisputed. The complainant's title and possession of the *ripa,* though put in issue by the answer, is established by the proofs and was finally admitted at the hearing. Their right to have the water come to them in its natural condition follows inevitably. *Holsman* v. *Boiling Spring Co., 1 Mc-Cart. 335* (at *p. 343, bottom*), and cases there cited. The learned chancellor there says: "Where the complainant seeks protection in the enjoyment of a natural water-course upon his land, the right will ordinarily be regarded as clear. And the mere fact that the defendant denies the right by his answer or sets up title in himself by adverse user, will not entitle him to an issue before the allowance of an injunction."

There can be no doubt that, upon the facts presented, it would be the duty of a judge to direct a verdict, and the rule adopted by the court of errors and appeals in *Higgins* v. *The Water Co., 9 Stew. Eq. 538,* applies. I refer to the language of the chief-justice on *p. 544 et seq.*

The jurisdiction of this court to adopt, on final hearing, the extreme remedy of an injunction in this class of cases, when the right is clear, is well established, not only by the case just cited,

but by *Acquackanonk Water Co.* v. *Watson, supra,* which was decided by the court of errors and appeals, and by *Holsman* v. *Boiling Spring Co., supra,* decided by Chancellor Green, and by *Shields* v. *Arndt, 3 Gr. Ch. 234,* and by *Carlisle* v. *Cooper, 6 C. E. Gr. 576.*

It was suggested that in this case no injunction should be ordered, but that the complainants should be left to their action at law for damages. I am unable to adopt that view. It must now be considered as settled law in this state that the maintenance of a nuisance of the kind here in question is, in effect, a taking of property. *Pennsylvania Railroad Co.* v. *Angel, 14 Stew. Eq. 316* (at *p. 329*), where Judge Dixon, speaking for the court of errors and appeals, says : " This principle rests upon the express terms of the constitution. In declaring that private property shall not be taken without recompense, that instrument secures to owners, not only the possession of property, but *also those rights which render possession valuable.* Whether you flood the farmer's fields so that they cannot be cultivated, *or pollute the bleacher's stream so that his fabrics are stained,* or fill one's dwelling with smells and noise so that it cannot be occupied in comfort, you equally take away the owner's property. In neither instance has the owner any less of material things than he had before, but in each case the utility of his property has been impaired by a direct invasion of the bounds of his private dominion. This is the taking of his property in a constitutional sense ; of course, mere statutory authority will not avail for such an interference with private property. This doctrine has been frequently enforced in our courts," and he proceeds to cite previous authorities in the same court. If this be so, then the legislature has no power to authorize the maintenance of a nuisance for the promotion of private objects, even upon terms of making compensation. For no authority is necessary for the position that the legislature is powerless to enact a law declaring that defendant may have complainants' mill and water-power upon terms of paying them what a court may ascertain it is worth. And I am unable to distinguish such action and that of leaving complainants to the remedy of repeated actions at law

to recover damages as often as they are suffered.    In this respect, our system of laws varies from that of England, where parliament is omnipotent and is not confined to the mere making of laws—the true function of a legislature—but may take private property for private purposes, with or without making compensation, the only restraint upon its power being its own innate sense of justice.    Hence, the English courts are authorized, in cases of certain nuisances, to give damages once for all instead of an injunction.

The result of my consideration of the subject is, that there is no principle which will sustain a court of equity in refusing an injunction against the maintenance of an established continuing nuisance and leaving the injured party to his remedy at law. To do so is, in effect, to permit a party to take his neighbor's land for his own use upon terms of making such compensation as a jury shall assess.    This is inadmissible.

The object and office of a verdict and judgment at law is to establish the right and give compensation for past injuries.    The right being once made clear, whether by judgment at law or upon incontrovertible rules of law and well-established facts, the remedy in equity by injunction to prevent future injury is a matter of right, and the relief cannot be refused.

The ground, however, mainly relied upon by defendant is that the proofs show that the nuisance has entirely abated and that there is no danger of its recurrence, and hence an injunction is unnecessary and improper.

At about the time the injunction was issued—July 17th, 1893 —defendant purchased a small tract of land skirting the railroad, between the shaft and the river, and established on it a settling basin, into which the mine water was turned and given opportunity for subsidence before reaching the river.    The result was that it was substantially clear, and no further injury has been since felt at the paper mill.    It is also in proof that from that time, up to July, 1894, the water was usually clear when it came from the mine.    At the sessions of December 27th and December 28th, 1893, Professor Nason, a competent geologist and mining expert, testified that, in his opinion, no further

clay and water-bearing seams or rents would be met in the course of defendant's mining operations, and that the rent which had given so much trouble had, by natural causes, become harmless. It was not suggested that all or any large proportion of the discolored clay deposit had been removed, but the theory was that the descending water had worn channels in the clay, resulting in little rivulets centering at the section by the shaft, and that the scouring power of the water—that is, its power to bring down clay—had ceased by reason of the clay banks and beds of the little rivulets having arrived at an "angle of repose." The stability of this state of affairs depends, of course, upon the uniformity of the flow of water, both as to quantity and source of inflow, and Professor Nason, on cross-examination, admitted some uncertainty in this respect. After his examination and the close of the evidence on both sides, and before the argument, viz., about July 16th, 1894, an unexpected influx of muddy water occurred, due to an overflow from a flume carrying water from the neighboring mine of the Lehigh Zinc and Iron Company, which found its way into the seam or rent at a point where it came to the surface, about one thousand eight hundred feet from the Parker (defendant's) shaft. This opening was a surface fissure or swallet in the rock, quite common where limestone rocks come to the surface. In this case, as I understand Professor Nason, he did not suppose or infer, from the trend of the fissure, that it reached the surface in that neighborhood, but such was the fact. It was promptly stopped by defendant and filled up, so as to prevent any more water getting in at that point.

Now, it seems to me that this occurrence shows the impossibility of affirming that there will be no further incursions of muddy water. It is true that with the continued use of the settling ground no injury will probably result to complainants from such an irruption. I say "probably," because in case of a sudden irruption of discolored water the quantity might be so great as to overwork the present settling basin. But without a decree and injunction, the defendant will be at liberty to discon-

Beach *v.* Sterling Iron and Zinc Co.

tinue its use and permit any muddy water that may appear to flow into the Furnace pond as of old.

At the time the complainants filed their bill the injury was serious and continuous. The defendant positively declined to stop it, but claimed the right to continue it. To complainants' bill was interposed a general denial, and setting up a right to persist in the injury as long as its necessities required. On all these issues the defendant is beaten. The complainants have established their case, and it would seem to be a most lame and impotent conclusion to refuse to give them the very relief prayed for, viz., a perpetual injunction. I am unable to imagine any other decree in their favor which would adequately meet the case and give them the just fruits of their suit; and, surely, if there is no danger of further discoloration the injunction will do the defendant no harm, but will be of value as a muniment of title to the complainants' property. The language of Lord-Justice Turner, in *Goldsmid* v. *Tunbridge Wells Commissioners, L. R. 1 Ch. App. 349* (at *p. 355*), applies: "In this particular case, I think that regard must be had not merely to the comfort or convenience of the occupier of the estate, which may only be interfered with temporarily and in a partial degree, *but that regard must also be had to the effect of the nuisance upon the value of the estate, and upon the prospect of dealing with it to advantage;* and I cannot but think that the value of this estate, and the prospect of advantageously dealing with it, is and will be affected by the continuance of this nuisance."

But the defendant further urges that the complainants have manifested a disposition to make an unreasonably harsh and oppressive use of their rights in the premises, and have thereby weakened their standing in equity and disentitled them to the extreme decree asked for.

In the month of March, 1893, while the outflow from the mine was at its worst, negotiations took place between the parties for some sort of settlement, and a filter was mentioned. The complainants offered to be satisfied if defendant would furnish them with a filter of proper size, which they said, and about which there is no dispute, would cost $5,000. The defendant

offered to pay one-half of the expense of the filter, the same to be in full compensation for all damages up to the time it was furnished, which offer the complainants refused to accept. I can see nothing harsh or oppressive in that refusal.

Next, and after bill filed, as I now recollect, defendant made an arrangement with the tenant of a grist mill, located upon a little stream which empties into the Furnace pond, for a right to divert water from the mill and carry it by a flume several hundred feet down to the complainants' works, and furnish them with clear water from that stream. Complainants employed an expert to examine the stream and see whether it would supply sufficient water for their paper engines, with the result that they were informed and believed that it was not sufficient, and declined to accept it as a substitute for the river water. The defendant, nevertheless, in the face of complainants' refusal, built the flume—a mere wooden trough, set upon benches and trestles—along the surface of the ground down to the mill yard of the complainants. The complainants refused to allow it to be put across their mill yard, because it would prevent them from having access to their works and from free passage with carts and wagons from one part to the other, and said that anything of that kind must be put underground in iron pipes. But the radical difficulty with that movement on the part of the defendant was, that the right to the use of the water was merely obtained temporarily from a mere tenant of the mill property, and did not give the complainants any permanent right to the flow of the stream, even if it had been large enough for their purposes. I can see nothing harsh or oppressive in complainants' action in refusing this offer of substitution. They not only had the strict right in law to refuse to accept them, but their conduct in so doing, in my judgment, was not inequitable.

I shall advise a decree establishing the complainants' right to the flow of the stream in its natural condition, and an injunction, with costs.