The Chancellor.
This bill is filed by the widow and heirs-at-law of Daniel Holsman, deceased, to restrain the continuance of a private nuisance. The bill charges that, in the year 1836, Daniel Holsman purchased a farm of about two hundred acres, lying on the bank of the Passaic river, in the county of Bergen; that the farm was purchased with the view of making it the permanent residence of himself and his family; that he erected upon it a large and expensive mansion-house and made other improvements, at a cost of $75,000 above the price of the land; that at the time of the purchase there was a stream of water, flowing in its accustomed channel through the land, near to the dwelling, which constituted one of the principal inducements for the purchase; that artificial lakes or ponds were constructed near to the mansion-house, supplied by the water of said stream, which were ornamental to the place, were used for procuring ie£, were stocked with fish, and furnished the necessary power for forcing the water to the dwelling and grounds adjacent, for domestic purposes, irrigation, and ornamental fountains. Daniel Holsman died on the twenty-seventh of October, 1840, intestate. The complainants are now the owners and occupants of the premises.
That in the year 1859 the defendants were incorporated, by an act of the legislature of this state, for the purpose of carrying on the business of bleaching and finishing cotton and woollen goods, and soon thereafter became the owners of a tract of land, pond, and mill premises adjoining the complainant’s land, and erected thereon a large mill and works for the purposes contemplated by their charter, which went into operation in the summer of 1860.
*339 That in the fall of that year, in consequence of large quantities of chemical matter and other impurities discharged from the works of the defendants into the stream above the land of the complainants, the water was filled with offensive matter, discolored and polluted, and rendered unfit for all domestic purposes, for procuring ice or for watering cattle, killing the fish and producing offensive odors, which infected the air of the neighborhood and penetrated the dwelling, so that the complainants have been compelled to refrain from all use of the said water for family or other purposes; by reason whereof the complainants are unable with comfort to use or enjoy tlieir said property, as they have been accustomed and of right ought to do, or to sell the same for a fair price.
The bill prays that the defendants may be restrained by injunction from injuring the water of the said stream for domestic purposes, and from discharging into it any chemical ingredients to pollute the air or water, or injure or destroy the fish in the said ponds.
The defendants, by their answer, do not deny the erection of their works, as charged in the bill, or the discharge of chemicals and other matter therefrom into the stream; but they allego that the nuisances of which the complainants complain are not occasioned thereby, but by other cairses; that they existed before the erection of the bleaching works, and so far as they may exist, are occasioned by mineral elements. in the water operating upon vegetable matter in the complainants’ ponds or by other causes. It denies that the chemicals used in the business of bleaching are noxious or unhealthful, and alleges that the principal ingredient is chlorine, known and used as a deodorizer and healthful disinfectant. It alleges that the lands and mill site used and occupied by the defendants had been used and occupied as a mill site for more than twenty years before the purchase by Daniel Holsman of the complainants’ premises, and that the business of fulling and dyeing had been there carried on for more than twenty years, and that the owners have a right *340 to use said stream for manufacturing purposes, although the same may taint and discolor the water.
The defendants, by their answer, further allege that they have commenced erecting, and will soon finish a bank or screen, through which they will cause all the waters of the stream that may come in contact with any drugs or chemicals used in the factory, or in contact with the goods bleached with such drugs or chemicals, to be filtered, which will eliminate from the water, before it passes upon the lands of the complainants, all such chemicals and drugs, and will cause the water to flow from the lands of the defendants as pure as when it enters thereon.
The cause has been put at issue, and is brought on for final hearing upon the pleadings and evidence.
That the water in the stream upon the complainants’ land has been, since the erection of the defendants’ works, from some cause discolored, polluted, and rendered unfit for domestic or ornamental purposes, and that th,e complainants’ premises have been thereby rendered uncomfortable, inconvenient, and undesirable for the purposes for which they were designed and for which they are used, is not denied by the defendants’ answer, and is fully established by the evidence.
I think the evidence renders it equally certain that those evils are occasioned by the bleaching works of the defendants. They arose after the works were erected and went into operation. They are perceived when the works have been in operation, and their magnitude bears a perceptible proportion to the amount of business done by-the defendants. The stream upon which' the works are erected is at all times very small, being but a mere spring run, and in the heat of summer its volume is materially diminished. The works are very extensive, and the amount of chemicals used in the process of bleaching very great. One of the witnesses, whose evidence probably furnishes a reliable proximate view of the amount and character of materials used *341 and lost in the process of bleaching, furnishes this statement :
In the process of bleaching, an ordinary charge of goods which are bleached together consists of three tons. There will be required to bleach this quantity of goods, on an average, the following amount of chemicals, viz. lime 225 pounds, vitrol 125 pounds, soda ash 325 pounds, chlorine 150 pounds, making 825 pounds of chemicals used in the process. The goods will lose fifteen per cent., or 900 pounds of vegetable oil and fibre, making, besides the starch extracted from the goods, 1725 pounds of foreign matter thrown into the stream from every charge. The mills, in full operation, turn out more than two charges per week, making over 3400 pounds of chemicals, vegetable oil, and fibre, besides starch, thrown into the stream weekly. When it is remembered that the stream is very small, and this amount of foreign matter is constantly being thrown into it within one quarter of a mile of the complainants’ premises, it is certainly no task upon our credulity to believe that the water must be most seriously polluted by the process. Nor is this conclusion in any wise shaken by any of the material facts proved on the part of the defence. It may be, as testified by witnesses on the part of the defendants, that an equal or greater amount of foreign matter from a bleaching establishment may be thrown into a river or large stream without producing any perceptible injury at a short distance from the works; that upon smaller streams the operations of bleaching establishments may be rendered innocuous by means of filters or other mechanical contrivances; that a large proportion of the bleaching materials are healthful disinfectants, and are rapidly deposited, and that the mineral ingredients of the water in the watercourse on the complainants’ lands, as it flows naturally from the springs, may so act upon the vegetable matter upon the banks or bottom of the stream as to produce, especially in the drought and heat of summer, offensive odors independently of the defendants’ works. All these facts may be fully admitted, and yet the case made by the complainants’ evi *342 dence remain unshaken. The defendants themselves, by their pleadings and evidence, manifestly evince their apprehension of danger to the purity of the stream and the rights of the adjoining proprietors from the operations of bleaching. They prove that filters are erected and used . upon small streams where bleach works are in operation to purify the water after leaving the works. By their answer, they allege that they propose to erect a filter, by which all drugs and chemicals will be eliminated from the water before it passes upon the complainants’' lands. The evidence shows that a filter was constructed by the defendants, as proposed in their answer, but that from defective construction, or some other cause, it signally failed to perform its office. It would be unprofitable to enter into an examination in detail of the very voluminous testimony in the cause. A careful examination of the evidence satisfactorily establishes the existence of the injury, and that it is occasioned by the works of the defendants.
The facts being ascertained, is this a proper case for the interference of the court by injunction ?
Every owner of land through which a stream of water flows is entitled to the use and enjoyment of the water, and to. have the same flow in its natural and accustomed course, without obstruction, diversion, or corruption. The right extends to the quality as well as to the quantity of the water. If, therefore, an adjoining proprietor corrupts the water, an action upon the case lies for the injury. Aldred’s case, 9 Coke 59; Mason v. Hill, 5 Barn. & Ad. 1; Magor v. Chadwick, 11 Ad. & El. 571; Stoneheever v. Farrar, 6 Ad. & El. (N. S.) 730; Howell v. McCoy, 3 Rawle’s R. 397; Wood v. Wand, 3 Excheq. 72; Phear on Water Rights 29; Angell on Watercourses, § 136.
The Court of Chancery has a concurrent jurisdiction with courts of law, by injunction, equally clear and well established, in cases of private nuisance. And it is a familiar exercise of the power of the court to prevent by injunction injury to watercourses by obstruction or -diversion. Finch v. Res *343 bridger, 2 Vern. 390; Bush v. Western, Prec. in Chan. 530; Gardner v. Village of Newburgh, 2 Johns. Ch. R. 165; Shields v. Arndt, 3 Green’s Ch. R. 234.
The right of the riparian proprietor, says Chancellor Kent, to the use and enjoyment of a stream of water in its natural state is as sacred as the right to the soil itself. It is a part of the freehold of which no man can be disseized but by lawful judgment of his peers or by due process of law. 2 Johns. Ch. R. 166.
A disturbance or deprivation of that right is an irreparable injury, for which an injunction will issue.
If the deprivation of the use of the water by diversion constitutes such an irreparable injury as will be restrained by injunction, the deprivation of its use, by so corrupting it as to render it unfit for use, is an equally irreparable injury entitling the party injured to the like preventive remedy.
To entitle the party to the remedy by injunction in cases of private nuisance, the right must be clear, and the injury must be such as from its nature is not susceptible of being adequately compensated for by damages, or such as from its long continuance may occasion a constantly recurring grievance, which cannot bo prevented otherwise than by injunction.
Where the nuisance operates to destroy health or to diminish the comfort of a dwelling an action at law furnishes no adequate remedy, and the party injured is entitled to protection by injunction. Daniell’s Ch. Prac. 1858; 2 Story’s Eq., Jur., § 926, 927.
The remedy was applied to the case of the pollution of a watercourse in Wood v. Sutliffe, 8 Eng. Law and Eq. 217 ; Lewis v. Stein, 16 Alabama R. 214.
It is urged that the right of the complainants is not clear, and must therefore be first established at law before an injunction will issue.
Where the complainant seeks protection in the enjoyment of a natural watercourse upon his land the right -will ordinarily be regarded as clear; and the mere fact that the de *344 fendant denies the right by his answer, or sets up title in himself by adverse user, will not entitle him to an issue before the allowance of an injunction. Bush v. Western, Prec. in Chan. 530; Gardner v. Village of Newburgh, 2 Johns. Ch. R. 165; Shields v. Arndt, 3 Green’s Ch. R. 234.
The defendants, by their answer, allege that the site occupied by them was used and occupied as a mill site more than twenty years before Holsman purchased; that the business of fulling and dyeing had been carried on for more than twenty years, and that the owners have consequently a right to use the stream for manufacturing purposes, although the same may taint and color the water. The defendants offered evidence tending to show that there was a mill upon the defendants’ premises as early as 1814; that the mill was used for fulling, dyeing, and sawing. The saw dust and the refuse of the fulling and dyeing mill went down the stream. The mill site was so occupied until 1843 without change in the character of the business. After 1843, it was rented for six or seven years to a hatter, and the refuse from the dyeing kettles went down the stream. The fact of the adverse user for twenty years is not satisfactorily established by the defendants’ own testimony. The material witness relied upon to sustain the allegation testifies that he came into possession of the property in 1838 or 1839, about the time he came of age. The time that he came into possession of the property he afterwards fixes in 1843. Whether he means to say he came of age in 1838 or 1843 is not clear. But in either case he manifestly testifies to facts which occurred before he was born and to facts of which he could have no knowledge. But admitting the fact to be clearly established that a fulling and dyeing mill and a saw mill were upon the premises as early as 1814, and were continuously used for twenty years, it does not sustain the claim of an adverse right set up by the defendants. The nuisance complained of is not the existence of the mill nor its immediate operation. The mill, as at present used, is not driven by the water of the stream. Its motive power is steam. . The complaint is that chemicals and other *345 foreign and offensive matter is discharged into the stream at the defendants’ works, of such character and in such quantities as to render the water of the stream on the lands of the complainants, unfit for household use and for other purposes to which it was applied by the complainants. The existence of the defendants’ mill, or the discharge of dyeing materials or drugs into the stream, on the defendants’ lands, constitutes no injury to the complainants, if their unsufructuary right to the stream is not interfered with. ( The defendants have a right to use the water upon their own soil in such manner as they may deem for their interest, provided they discharge it upon the soil of the complainants, in its accustomed channel, pure and unpolluted. They can therefore acquire no right by prescription until they show that the acts which are claimed to constitute the adverse user injured the complainants, and gave to them, or those under whom they claim title, a right of action. The very ground of title by adverse enjoyment is that the party against whom it is set up has so long permitted the adverse enjoyment, and failed to vindicate his rights, that the presumption of a grant is raised. But there can be no such presumption, and consequently no title by adverse enjoyment, where no violation of a right is shown to exist.J Thus where an action is brought for overflowing the plaintiffs’ land by backwater from the defendants’ milldam, it establishes no title by adverse enjoyment to prove that the defendants’ mill has been in existence over twenty years, or that the dam has been in existence for that peried. The question is not how high the dam is, but how high the water has been held, whether it has been held for twenty years so high as to affect the land of the plaintiff as injuriously as it did at the time of the action brought.
To prove, therefore, that there was a fulling and dyeing mill or other manufactory for twenty years on the defendants’ land, and that they discharged drugs and dyestuffs into the stream during that period, proves nothing, unless it is shown that the materials discharged into the stream were of *346 such character and of such an amount as to pollute the water which flowed upon the complainants’ land, and rendered it unfit for use. If the evidence stops short of that, it -proves no adverse enjoyment in the defendants or those under, whom they claim. I find no such evidence in the cause.
Again, it is a familiar principle, as applied to the doctrine of adverse enjoyment, that the right acquired must be commensurate with the extent of the enjoyment. The extent of the right is to be measured and regulated by the extent of the enjoyment upon which the right is founded. Angell on Watercourses, § 224, 226.
Admitting, then, that dyestuffs from the fulling and dyeing mill and saw dust from the saw mill were discharged into the stream at the site of the defendants’ works for twenty years consecutively, in the exercise of an adverse enjoyment to the right of the complainants, the right acquired must be commensurate in character and extent with the enjoyment. - The practice of throwing saw dust into the stream cannot establish the right of discharging into it poisonous and noxious drugs. Discharging one hundred gallons of dyestuffs weekly cannot establish the right of discharging into the stream, in the same period of time, over 3400 pounds of chemicals, starch, vegetable oils, and fibre.
There is no satisfactory evidence of the extent to which the operations of dyeing or hatting were carried on upon the defendants’ premises. But it seems abundantly clear that the discharge from a hatter’s kettle or from a small country fulling mill into the stream could never establish a right so to conduct the operations of extensive bleach works as to discharge weekly into the stream many hundred weight of chemicals and vegetable matter.
Looking alone to the legal rights of these parties, and to the well settled principles of courts of equity in the exercise of its protective powers for the maintenance of those rights, I think the complainants are entitled to an injunction.
*347 There are other elements which have been introduced into this cause which demand a passing notice. Much evidence has been offered (I do not say improperly) on the one hand to show the great value of the complainants’ property, and the variety of purposes, necessary, convenient, and ornamental, to which the water of the stream is applied; and on the other, the extent and value of the defendants’ manufacturing operations, and the benefit thereby conferred upon the community in which they are located. These are considerations which naturally do, and which perhaps in some cases may legitimately influence a court of equity in the exercise of its discretion. But these considerations can exercise no influence in the determination of the present case. The legitimate ground for the allowance of the injunction is not so much the intrinsic value of the property sought to be protected as its essential character and its importance to the complainants. The injunction is allowed, not upon the ground that the complainants’ premises are occupied by a family of wealth and taste; that the water is used for supplying fish ponds, and fountains, and conservatories, and other purposes of ornament, taste, and luxury, but because the wrong complained of deprives the complainants of one of the essential elements of life, because it seriously interferes with the daily health, comfort, and enjoyment of the family, and because the injury, in its essential character, is one for which no damages which a jury may give can compensate.
And in this view the injunction should freely issue to protect the humblest cotter who complains against the pollution of the spring at his cottage door, from which his family derives their daily supply of water for domestic use.
On the other hand, it will be observed that the injunction asked for is not designed to stop the defendants’ works, or to interfere with their operations, but simply to restrain them from discharging offensive matter into the stream, and thereby polluting the waters which flow upon the complainants’ land. There is no evidence in the cause that these *348 refuse materials cannot, at small cost or inconvenience, be discharged elsewhere; and if they cannot, it was the defendants’ own folly that subjects them to the greater cost and difficulty of guarding against an invasion of the complainants’ rights.
There is other evidence in the cause, which, whatever may be its legal operation, places the complainants’ claim to the protective power of a court of equity upon very strong grounds.
It is alleged in the bill, and admitted by the answer, that before the defendants were incorporated, and while those interested in the enterprise were negotiating for the purchase of the land for the erection of their bleach works, the complainants, fearing its prejudicial influence upon the waters of the stream, caused the following notice to be served, by their attorney, upon the agent of the parties who were about making the purchase.
“Paterson, Oct. 9th, 1858.
I am informed that you are about purchasing the Van Winkle mill in Union township, Bergen county, near Acquackanonk, for the purpose of bleaching or for some such purpose. I hereby give you notice that the stream on which the said mill is built runs through the lands belonging to the heirs of Daniel Holsman, deceased, and supplies the pond on said property, and the water of said stream is used by the family for all family purposes, and you are forbidden using the water of said stream in any way that will prevent the use of said water for family or farm purposes, or for any other purpose, or that will destroy or injure the fish in said pond.”
The purchase of the property was subsequently made with full knowledge, on the part of the purchasers, of the rights of the complainants.
It is further charged by the bill, and admitted by the answer, that subsequently the said parties applied to the legislature of this state to incorporate them, and all such persons *349 as might be associated with them, by the name and style of “ the Boiling Spring Bleaching Company,” to be located in the township of Union, in the county of Bergen, for the purpose of carrying on the business of bleaching and finishing cotton and woollen goods; that while the said bill was pending before the legislature, the complainants opposed the passage of the bill upon the express ground that the business to be carried on by the company would injure the complainants ; that thereupon, in order to satisfy the complainants, the applicants for said bill agreed to insert therein the following proviso: “ and provided also, that the said the Boiling Spring Bleaching Company shall not divert the water which flows through the lands of the estate of Daniel Hols-man, deceased, from its present channel, and that the water of the said stream shall not be injured on said land for domestic purposes;” that thereupon the said proviso was inserted in the charter of the company, and the complainants, in consideration thereof, withdrew their opposition to said bill, and it passed the legislature and became a law.
For the purposes of this cause, I deem it immaterial whether the notice thus given, and the proviso thus inserted in the defendants’ charter, in any wise affected the legal rights of the parties.
But it would bo grossly inequitable to permit a party who purchased with distinct notice of the complainants’ rights, and who obtained and accepted their charter with a proviso that the rights of the complainants should not be infringed, to inflict that injury upon the complainants, in violation not only of the express provision of their charter, but of their own implied undertaking.
Such an agreement upon the part of a company, while procuring a charter, constitutes a strong claim for the exercise of the extraordinary power of the court to arrest the injury. Similar agreements are not unusual on applications to parliament for the incorporation of railroad companies, when the application is opposed by a landholder fearing injury from the construction of the road; and the courts *350 have held, that where an agreement was made hy the projectors of the road, the corporation could not be allowed to exercise the rights given to them by the act without regard to the antecedent agreement that those rights should only be exercised in a particular manner; and the cases proceed to some extent on the equity created by the party claiming relief having, on the faith of stipulations on the part of the company, retired from contesting the grant of its privileges and powers. Brewry on Injunctions 285 — 300.
The complainants are entitled to the relief prayed for.