40 N.J. Super. 62 (1956)
122 A.2d 233
BOROUGH OF WESTVILLE, ET AL., PLAINTIFFS-APPELLANTS,
v.
WHITNEY HOME BUILDERS, INC., ET AL., DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued February 20, 1956.
Decided April 13, 1956.
*65 Before Judges GOLDMANN, FREUND and CONFORD.
Mr. W. Louis Bossle argued the cause for plaintiffs-appellants.
Mr. Louis B. LeDuc argued the cause for defendants-respondents (Messrs. George B. Marshall; Walter L. Marshall and Martin F. Caulfield, attorneys).
The opinion of the court was delivered by CONFORD, J.A.D.
The plaintiff, Borough of Westville, is a municipality in Gloucester County. It is situated on the outskirts of Camden, near the Delaware River. The *66 Township of Deptford adjoins it on the south. The defendant, Whitney Home Builders, Inc., has been engaged in the construction of a one-family residential development in Deptford, near the Westville line. In connection therewith its principals caused to be incorporated the defendant, Woodbury Terrace Tract Corp., as a sewerage company, under and pursuant to Revised Statutes, Title 48, Public Utilities, chapter 13, for the purpose of collecting, treating and disposing of the house sewage of the homes in the development. As required by the statute, the consent of the governing body of Deptford was secured, subject to an irrevocable option to the township to acquire the sewerage system constructed by the sewerage company at a price fixed in the ordinance of consent.
Under plans approved by the State Board of Health in the summer of 1954, the defendant sewerage company has constructed in Deptford, near the Westville boundary, a sewage treatment plant geared to handle and treat the sewage from 300 homes. The plant went into operation the latter part of December 1954. At the time of the trial of this cause in April and May 1955, some 30 homes were being serviced. The gravamen of this action concerns the disposition of the liquid effluent of the treated sewage. It is discharged into a small natural stream or ditch which traverses the property of the defendants and flows thence in a northeasterly direction through Westville somewhat less than a mile and then empties into a pond, which, with part of the ditch, is situated in the borough's principal park. The park land was acquired by the borough by tax foreclosure in 1939. The pond drains over a spillway on its easterly bank into an outlet to the waters of Big Timber Creek, some 1,000 feet away, a tributary of the nearby Delaware.
Both the ditch and the pond originate in natural watercourses fed by surface waters. In 1940 the pond was improved in the course of a federal W.P.A. project for conversion of the foreclosed land into a park. The pond averages two to three feet in depth and is now about 500 feet in length. It has been used for many years by the public for *67 skating in winter and by boys for fishing and, occasionally, wading in summer. Wading in recent years has apparently been infrequent. Since the construction of the park it has been a recreational center of the borough. There are benches around the pond and basketball and baseball play areas. It is the locale for all public patriotic exercises and the situs of memorials for veterans of both world wars. A newly erected schoolhouse is situated west of the park, near the pond.
The plaintiff borough contends that at times the ditch runs dry. The testimony would seem to indicate that this seldom, if ever, occurs, but that in times of drought the flow is reduced to a trickle. During a dry period in the summer of 1954, the flow near the pond was about 15 inches wide and one inch deep and the pond bed somewhat exposed. When rains are flush, the pond overflows its banks by some 15 to 20 feet.
The plaintiffs named in the complaint, which was filed August 2, 1954, were the borough and the local board of health. They alleged the impending construction of the sewerage system, the proposed discharge of the sewage effluent into the ditch and its consequent flow from the ditch into and through the park pond. The threatened use of the ditch was described as "deleterious" and plaintiffs charged:
"(a) that they have a right that the surface waters which heretofore have flowed through said ditch shall not be contaminated or polluted by the discharge of the effluent from said proposed sewerage disposal plant; and
(b) that the discharge of said effluent, if permitted, would create a public nuisance and be productive of a hazard to the public health."
and demanded judgment of injunction and damages.
On October 20, 1954 the Chancery Division granted a motion dismissing the complaint insofar as it is prosecuted by the local board of health for the reason that the Legislature has vested exclusive control and jurisdiction over sewage disposal plants discharging effluent into any of the waters of the State in the State Board of Health and thereby precluded the authority of a local board of health to seek abatement *68 of such an enterprise as a public nuisance. Borough of Westville v. Whitney Home Builders, 32 N.J. Super. 538, 544 (Ch. Div. 1954), relying upon State Board of Health v. Borough of Vineland, 72 N.J. Eq. 862 (E. & A. 1907). No objection has been raised to that ruling. As to the complaint of the borough, however, in its guise as a plea by a lower riparian proprietor for restraint against the anticipated perpetration of a private nuisance in and upon the common waters, the defendants' motion for summary judgment was denied. (32 N.J. Super., at page 543).
Thereafter a pretrial conference produced a pretrial order, filed February 18, 1955, wherein the remaining count of the complaint is paraphrased as a cause of action by the borough, "as lower riparian proprietor, to restrain defendants, as upper riparian proprietors, from unreasonably contaminating or polluting, or further unreasonably contaminating or polluting, the waters" of the ditch * * * "by the discharge of sewage effluent into said ditch." The order set out defendants' denial that the rights of the plaintiff would be violated by the discharge and their assertion "that there will be no contamination or polluting of the waters of the ditch which is unreasonable in nature." The trial of the cause occupied three days and produced testimony running 428 pages of transcript and including some 26 exhibits. There was extensive expert testimony on both sides bearing, inter alia, upon the nature of the operation of the sewage plant and the condition of the waters of the ditch and pond prior as well as subsequent to the commencement of the flow of the effluent into the ditch. The trial court concluded that there had been no showing of contamination as it defined the term  "increase of bacteria and organisms," or of any "appreciable pollution." The showing as to prospective "putrescence" and decay from increased vegetation in the pond was found "too speculative" to found a claim for relief. The plaintiff's grievance was assessed as one solely "psychological or esthetic" in nature, and not, as such, the appropriate subject of injunctive relief. Judgment was entered on the merits for defendants.

*69 I.
A preliminary practice question is posed by defendants' renewal of objections, offered by them previously, to the plaintiff's appendix to its brief, on grounds of non-compliance with the requirement of R.R. 1:7-1(f) that there be included in the testimony printed such portions thereof "which appellant reasonably assumes will be relied upon by respondents in meeting the issues raised." About one-fifth of the entire testimony is reproduced, but only about one-ninth of that adduced by defendants. Only two exhibits are reproduced, none of them defendants'. A motion by defendants for a more complete appendix before another part of this Division was, we are informed by defendants without contradiction, denied on plaintiff's representation that its case on appeal could be rested on the pleadings and the trial court's decision. It will be apparent before we have concluded this opinion that plaintiff's presentation has not, in fact, been so limited and that we could not be expected to determine an appeal of a cause involving the important public health implications here manifested without an examination of substantially all of the evidence. Plaintiff is in default. Much of the evidence submitted by defendants reasonably requiring inspection for an appraisal of its defenses has been omitted from the plaintiff's appendix. The requirements of the rule leave much to the good faith of appellants if the rule is to operate fairly and serviceably for both court and parties. See De Caro v. De Caro, 13 N.J. 36, 41 (1953); State v. Schmelz, 17 N.J. 227, 238 (1955); Feddock v. New Jersey Realty Co., 28 N.J. Super. 400, 401 (App. Div. 1953); Mitchell v. Cavicchia, 29 N.J. Super. 11, 13 (App. Div. 1953); Josefowicz v. Porter, 32 N.J. Super. 585 (App. Div. 1954); State Highway Commissioner v. Union Paving Co., 33 N.J. Super. 85, 89 (App. Div. 1954).
In view of what has been said, however, we have examined the entire transcript and all the exhibits, and our determination *70 is predicated thereon. Defendants are consequently not prejudiced by the shortcomings of the appendix.

II.
Plaintiff purports at the opening of its argument to rely solely for its right to injunctive relief upon the asserted inherent offensiveness and loathesomeness of the sewage effluent, no matter how efficient defendants' treatment plant and relatively free from impurities the effluent, analytically speaking. It urges that the flow into the ditch and pond ipso facto introduces a self-evident "noisome substance" into the common watercourse, Worthen & Aldrich v. White Spring Paper Co., 74 N.J. Eq. 647, 654 (Ch. 1908), affirmed 75 N.J. Eq. 624 (E. & A. 1909), this amounting to an invasion of its property rights in its status as a riparian owner, which entitles it to relief without regard to the existence of damages in any other sense. It distinguishes its position from that of a complainant against a private nuisance not involving breach of property rights, from whom a showing of particular damages might be required as a prerequisite to injunctive relief. As to the theoretical merits of this position, we shall have comment hereinafter. We presently note that plaintiff's proofs and argument actually go beyond the simple position just stated. It offered proof and argument at trial and here bearing upon the health hazard assertedly constituted by the possible introduction of disease-bearing bacteria and viruses into the ditch and pond; and purporting to establish the prospect of increased vegetation and algae in the pond and consequent odors, elements implying more than mere psychological damage. It is, moreover, our own view that the evidence bearing upon the operation of the plant and as to the condition of the watercourses requires consideration upon this appeal as significant background both in relation to the contention as to the allegedly inherent offensiveness of the effluent and to an application of sound principles as to legal rights and obligations of riparian proprietors on a common watercourse. We thus proceed to a close look at the facts which emerge from the proofs.
*71 The plant of the defendant sewerage company here involved is known as a Griffith-Hays contact aeration sewage treatment system. At the time of the trial its service of 30 homes involved the handling of eight to ten thousand gallons of sewage per day. As noted, it is designed for a maximum of 300 homes. The raw sewage is pumped into the plant by electric motor and then it proceeds into a primary settling unit where it settles for two and one-half hours. The effluent then goes into the first of two aeration sections wherein electric blowers oxygenize it with air and thereby lower its biochemical oxygen demand (B.O.D.). Intermediate the aeration processes is a second settling section. During settling and aeration a further stabilization phase takes place by exposure of the sewage to biochemical activity on asbestos plates. This does not reach full efficiency until after the plant has been in operation several months. The sludge from the settled solids goes to a drying bed and is disposed of as fertilizer. The final settling is concomitant with heavy chlorination. Chlorine is a powerful disinfectant. From raw sewage to the stabilized, chlorinated effluent which is discharged into the ditch, the treatment process occupies a space of eight and one-half hours. Defendants' experts describe the end-product effluent as theoretically fit to drink or swim in (although they would personally do neither, for "psychological" reasons).
The defendants' testimony was that sewage treatment plants are generally designed on the basis that the solids, organic and inorganic, in raw public sewage average 200 parts per million of volume. The plant here involved is designed to reduce the organic substances by at least 85%, and the sanitary engineer who installed it, Lanning, testified other plants of that design had attained 90-95%. By comparison, the "Incodel" standard for sewage effluent allowed into the potable waters of the Delaware River is 85%, as measured by biochemical oxygen demand. "Incodel" is the four-state compact for conservation and protection of water resources in the Delaware River basin. L. 1939, c. 146. This plant also is designed to comply with Incodel standards *72 of a maximum biochemical oxygen demand of 50 parts per million and of a maximum reduction of the dissolved oxygen content of the water into which the effluent is discharged of 5%. There was expert proof here that the New Jersey State Department of Health has approved some twenty "Griffith" aeration plants; that the efficiency of such plants in New Jersey and elsewhere has been high, and higher than that of other kinds of sewage plants.
Water pollution is generally measured in important degree in terms of bacteria count and index of coliform microorganisms (B coli), the latter reflecting the degree of animal (including human) excrement. Analysis of the waters of the ditch and pond by an expert for defendants prior to the construction of the plant, on July 27, 1954, showed "gross pollution" at points above and below the proposed site of the sewage plant and in the pond, in terms both of bacteria and B coli. The measure of dissolved oxygen at the mouth of the pond was 1.9 parts per million in July, 1954, an indication of the beginning of putrefaction. All the witnesses testified that the polluted condition of the ditch and pond stemmed from the normal floatage of impurities on surface waters in such a semi-urban area.
Tests made April 7, 1955, after three months of operation of the plant, showed a bacteria count for the effluent vastly lower than for the water at various locations in the stream and pond, and this was also true as to the B coli index. Substantially similar results were indicated by analysis of samples taken May 16, 1955, and also by analysis made by one of the expert chemists, Corson, who testified for plaintiff. There were indications that the chlorine in the effluent had the beneficial effect of reducing the bacteria count of the stream for some distance below the point of discharge.
The analysis of the effluent also showed a lower (more favorable) B.O.D. (0.4 P.P.M. as compared with the Incodel maximum of 50.0) than in the samples from the watercourse, in ditch and pond. The remainder of the chemical analysis of the effluent made by defendants' expert chemist showed what he described as good, or very good, *73 conditions, in comparison with treated sewage effluent, generally. The amount of residual solids was such as to lead him to describe the effluent as "rather dilute."
Plaintiff's experts, Boyd, a sanitary engineer, and Corson, a chemist in the public health field, testified that some disease-bearing viruses or organisms found in human feces might survive the effect of the chlorination and treatment of the average sewage plant. Polio, hepatitis and typhoid were cited as examples. Neither of these experts was a bacteriologist. Corson conceded it would occur "extremely infrequently." Boyd admitted that on the basis of the amount of residual chlorine in the effluent, the possibility of escape of harmful bacteria was remote and that he did not consider himself "an expert on viruses." Lanning testified he considered the survival of harmful bacteria of fecal origin in the effluent as highly improbable.
The only other tangible, rather than psychological, objection advanced by plaintiff was to the possibilities of odor or stench. There was some evidence that when the plant operates at full capacity and there is simultaneously a period of low natural flow in the ditch, the volume of effluent may be expected to exceed that of the natural stream flow. Corson stated that at such times there would be stench in the pond, attributable to depletion of dissolved oxygen in the sewage. But this is seen to be without warrant, in view of the unchallenged results of the tests made by defendants' chemist, Beltz, which showed the effluent to have substantially lower B.O.D. than the waters of the stream and pond and quite similar proportions of dissolved oxygen. Boyd offered a different thesis for prognosticating an "odor of decay." It was that the chemicals in the effluent would cause "lushness of vegetation" in the pond and that such vegetation would "smell" in dry periods. Both Beltz and Lanning testified there would not be increased plant growth. The evidence is that there generally is considerable plant life in the pond in summer and that no odors have ever emanated therefrom. The conclusion of the trial court that the evidence of potential *74 odors from vegetation or putrescence is speculative seems to us a fair characterization, on the present record.
Some emphasis is given by plaintiff to the dangers of possible failure of electric current at the plant. There are auxiliary gasoline motors for some of the electrical equipment. The eight and one-half hours it takes the sewage to go through the plant would seem to provide adequate leeway for restoration of power in almost any contingency. In any event, this type of failure is a risk of every function of modern life dependent upon electric power.

III.
Defendants contend that, in effect, this is an action to enjoin a public nuisance, a remedy assertedly granted but rarely, and then only at the suit of the Attorney-General. But see Mayor, etc., of Alpine v. Brewster, 7 N.J. 42, 52 (1951), as to cases where an individual has also sustained special damage over and above the public injury. We need not pursue that legal inquiry, as it is not now claimed by the plaintiff borough or apparent to us that it is here sought to enjoin a public nuisance. We take it that plaintiff seeks only to vindicate its proprietary right as a riparian owner to have abated what it conceives to be a misuse to its detriment by another riparian proprietor of the common water-course. The maintenance of such an action is clearly its right notwithstanding its status as a municipal corporation. 11 McQuillin, Municipal Corporations (3rd ed. 1950) § 31.19, p. 215; cf. Paterson v. East Jersey Water Co., 74 N.J. Eq. 49 (Ch. 1908), affirmed 77 N.J. Eq. 588 (E. & A. 1910). Its ownership of the land in the park and its use of the pond for recreational purposes supports its authority to apply to the courts for relief against such actions as it conceives to be wrongful and injurious to the public in its enjoyment of the facilities maintained by the municipality. See Price v. Inhabitants of Plainfield, 40 N.J.L. 608, 611 (E. & A. 1878); cf. Newark Aqueduct Board v. Passaic, 46 N.J. Eq. 552, 553 (E. & A. 1890); City Affairs Committee *75 of Jersey City v. Jersey City, 134 N.J.L. 180, 182 (E. & A. 1946); and see 17 McQuillin, op. cit. supra, § 49.57, p. 292.

IV.
We thus come to a consideration of the law governing the mutual rights and obligations of riparian owners, inter sese, in respect to the use of the water flow. It will be seen that this subject, in New Jersey as elsewhere in this country, is in a state of some doctrinal confusion. The early history of this field is summarized by the American Law Institute in the Restatement, Torts, chapter 41, scope note, pp. 341, 342:
"In the early English Common Law there was little litigation over the private use of water. The uses for water were limited mainly to use for domestic purposes and for running small grist mills, and the law in respect to such uses was relatively simple: `First come, first served.' Each landowner was regarded as having the privilege of using the water on his land for his own ordinary purposes irrespective of the effect on others, but this was not as harsh a rule as it might seem, for the simple reason that such use seldom had any material effect on others. There was water enough for all because there were no such things as public waterworks, sewage disposal systems, large factories and power plants.
With the beginning of the industrial revolution, however, the situation changed. There arose many new uses for water which either consumed large quantities of it or polluted it to such an extent that it was of little use to others. The resulting conflict of interests in the use of water demanded a more equitable rule than `first come, first served.' Story and Kent, with their knowledge of Roman Law, seized upon the law of Riparian Rights and applied it to these new and `extraordinary' uses. In brief, that theory of law embodied the principle that all riparian proprietors on a watercourse or lake have equal rights in respect to the use of the water, and that none can use to the extent of depriving others of an equal opportunity to use.
This law of Riparian Rights, although originating in this country, found its way into the English cases between 1820 and 1840 and was fully expounded in the classic case of Embrey v. Owen, 6 Exch. 353, decided by Baron Parke in 1851. That case is one of the leading cases on the subject and has often been cited and quoted both in this country and in England.
The application of the principle of equal rights to particular cases has proved a difficult task to most of the courts and there has been no uniform agreement among them as to exactly what is meant by equal rights. * * *"
*76 While the "first come, first served" concept referred to above became firmly imbedded in a doctrine of "prior appropriation" in many western states, by decision and statute, because of the geography of aridity and the incidents of frontier history, Comment, 19 Mo. L. Rev. 138, 139 (1954), it has been customary to say that most of the American states transmuted the philosophy of "equal rights" into one or the other of two particular rationales, the "natural flow" theory and the "reasonable use" doctrine.
The natural flow theory, long held in England, contemplates that it is the right of every riparian proprietor to have the flow of water across his land maintained in its natural state, not sensibly diminished in quantity or impaired in quality. Each may use the water for "natural purposes," or for extraordinary needs when there is no material effect upon the water and the use is on or in connection with the use of the riparian land. Holsman v. Boiling Spring Bleaching Co., 14 N.J. Eq. 335, 342 (Ch. 1862); John Young and Co. v. Bankier Distillery Company [1893], A.C. 691, 698 (House of Lords); Restatement, Torts, chapter 41, scope note, pp. 342, 343; Maloney, The Balance of Convenience Doctrine, 5 So. Car. L.Q. 159, 169 (1952); Coulson and Forbes, The Law of Waters (6th ed. 1952), p. 191; 2 Farnham, Waters and Water Rights (1904), § 464, p. 1573; 6A American Law of Property (1954), § 28.56, pp. 161, 162.
The reasonable use doctrine does not concern itself with the impairment of the natural flow or quality of the water but allows full use of the watercourse in any way that is beneficial to the riparian owner provided only it does not unreasonably interfere with the beneficial uses of others, the court or jury being the arbiter as to what is unreasonable. Restatement, Torts, chapter 41, scope note p. 344; Maloney, op. cit., supra, at p. 170; Comment, supra (19 Mo. L. Rev., at pp. 139, 140). The American Law Institute favors this approach on the basis "that it is entirely utilitarian and tends to promote the fullest beneficial use of water resources," Restatement, Torts, chapter 41, scope note pp. 345, 346. Although the "natural flow" interpretation of the equal *77 rights doctrine is generally ascribed to Mr. Justice Story, Tyler v. Wilkinson, 24 Fed. Cas. 472, No. 14,312 (C.C.D.R.I. 1827), and to Chancellor Kent, 3 Kent's Comm. (14th ed. 1896), p. 682 et seq. (1828), Maloney, op. cit., supra, at p. 169, United States v. Gerlach Live Stock Co., 339 U.S. 725, 745, 70 S.Ct. 955, 94 L.Ed. 1231 (1950), a modern scholar refers to their view in terms of assertion that the court "applies the equality [of use] to each case by declaring what, in its discretion, it considers to be reasonable use under the case's particular circumstances." Wiel, Fifty Years of Water Law, 50 Harv. L. Rev. 252 (at p. 252) (1936). In inquiring as to whether this insight fairly summarizes what New Jersey courts have done in water law, we may lay to one side cases having to do with such matters as obstruction, detention or diversion, or concerning waters which do not run in a fixed surface course. For purposes of the case before us, the issue narrows to pollution or contamination of waters flowing in a fixed watercourse, that being the present charge.
An examination of the cases shows that while they sometimes repeat the rule in terms of natural flow and quality, expressions of criteria sounding in reasonable use are also to be found, sometimes in the same case, and that none of the decisions is inconsistent on its facts with the rationale of reasonable use.
In Holsman v. Boiling Spring Bleaching Co., supra, defendant's discharge of chemical matter into a stream above the lands of complainant, a householder, discolored the water and rendered it unfit for domestic purposes, ornamental fountains and irrigation, and produced offensive odors. The Chancellor held of no consequence defendant's showing that its discharge acted as a disinfectant and that plant life in the stream carried offensive odors independently of defendant's works. The court said (14 N.J. Eq., at page 342):
"Every owner of land through which a stream of water flows is entitled to the use and enjoyment of the water, and to have the same flow in its natural and accustomed course, without obstruction *78 diversion, or corruption. The right extends to the quality as well as to the quantity of the water."
The injunction was allowed "because the wrong complained of deprives the complainant of one of the essential elements of life, because it seriously interferes with the daily health, comfort, and enjoyment of the family" (at page 347). Other cases stressing the right of the lower owner to have the water come to him "in its natural condition," "unchanged in quality," are Beach v. Sterling Iron & Zinc Co., 54 N.J. Eq. 65 (Ch. 1895), affirmed sub nom. Sterling Iron and Zinc Co. v. Sparks Manufacturing Co., 55 N.J. Eq. 824 (E. & A. 1896) (defendant's highly colored mine water preventing plaintiff's manufacture of white tissue paper, requiring clear water); Attorney-General v. Stewart & Taylor, 20 N.J. Eq. 415, 419 (Ch. 1869), injunction made perpetual, 21 N.J. Eq. 340 (Ch. 1871), by way of dictum, no riparian proprietor being a complainant (discharge of blood of 100 slaughtered hogs daily into Assanpink Creek described as a pollution or corruption thereof "for most of the purposes for which it may be used" by lower owners); Acquackanonk Water Co. v. Watson, 29 N.J. Eq. 366, 369 (E. & A. 1878) (letting canal water into a brook of purer quality so as to impair its utility for bleaching purposes).
The American Law Institute has said:
"Most courts, either not realizing that there are two distinct theories [natural flow and reasonable use] or not fully grasping their fundamental differences, attempt to apply both theories, with results that are not only illogical but weirdly inconsistent at times," Restatement, Torts, chapter 41, scope note, p. 346.
The Acquackanonk Water Co. case, supra, is a good example of such a mixture of concepts. After referring conventionally to the equal right of flow "without diminution or alteration" (29 N.J. Eq., at page 369), the opinion goes on (at page 370):
"The owner must so use and apply the water as to work no material injury or annoyance to his neighbor below him, who has an equal right to the subsequent use of the same water. * * * All *79 that the law requires of the party by or over whose land a stream passes is, that he should use the water in a reasonable manner, and so as not to destroy or render useless, or materially diminish or affect the application of the water by the proprietors above or below on the stream." (Emphasis added)
This excerpt is substantially the reasonable use rule, and it clearly reflects the court's philosophy in the particular case. There may be "alteration" of the natural state of the water if the use is reasonable and there is no material effect upon the reasonable use of another. There material injury to another proprietor was patent.
In Worthen & Aldrich v. White Spring Paper Co., supra, cited by plaintiff for its stated proscription of the appreciable discharge of "noisome substance" into the water (74 N.J. Eq., at page 654), the complainant operated a bleachery, which required a large quantity of pure water. The defendant, an upper riparian proprietor, manufactured paper from cotton and linen rags in such manner as to cast large quantities of small particles of cotton fibre into the stream and thereby seriously hamper complainant's operations. An injunction issued. While concluding that complainant had a right to have the water flow to its land "in its natural and unpolluted state and condition" (74 N.J. Eq., at page 658), it formulated the rule of mutual rights thusly (74 N.J. Eq., at page 653):
"The defendant is, of course, entitled to a reasonable use of the waters of the stream, but that use must be lawful, and must be exercised with a due regard to the lawful rights of lower proprietors, and especially is this true with regard to the charge of pollution."
See Doremus v. City of Paterson, 65 N.J. Eq. 711, 712 (E. & A. 1903); Auger & Simon Silk Dyeing Co. v. East Jersey Water Co., 88 N.J.L. 273, 275 (E. & A. 1915). See also the discussion in 93 C.J.S., Waters, where, in successive asseverations, a riparian owner is said to have a "natural easement" "to have the water flow pure and undefiled," and that right is nevertheless stated to be "subject to the right of each riparian proprietor to use the stream to a reasonable extent, and whether or not a pollution of the *80 waters of a stream is an actionable injury to a lower riparian proprietor depends on whether it is the result of such a reasonable use of the stream as the upper owner is entitled to make or of an unreasonable use in excess of his rights." § 43, p. 688, citing many cases exemplifying the reasonable use doctrine.
An illuminating variant of the reasonable use doctrine is its expression in terms of "fair participation" between riparian owners. In Sandusky Portland Cement Co. v. Dixon Pure Ice Co., 221 F. 200, L.R.A. 1915E, 1210 (7th Cir. 1915), certiorari denied 238 U.S. 630, 35 S.Ct. 793, 59 L.Ed. 1497 (1915), a lower owner who manufactured ice from river water was held entitled to an injunction against the heating of the water by an upper proprietor to an extent which materially retarded the formation of ice. The court said (221 F., at page 204):
"Complainant may not insist on such a use of the water by the defendant as will deprive the latter of any use thereof which may be necessary for its business purposes, provided complainant can by reasonable diligence and effort make the flowing water reasonably answer its own purposes. There must be a fair participation between them. * * * But where, as in the present case, it is shown by the evidence that defendant's use of the river water, while essential for its own purposes, entirely destroys the right of complainant thereto, there can be no claim by defendant that its use thereof is reasonable. In other words, the emergency of defendant's needs is not the measure of its rights in the water."
And see Walker Ice Co. v. American Steel & Wire Co., 185 Mass. 463, 70 N.E. 937, 940 (Sup. Jud. Ct. 1904); Dunlap v. Carolina Power & Light Co., 212 N.C. 814, 195 S.E. 43, 46 (Sup. Ct. 1938); Kasuba v. Graves, 109 Vt. 191, 194 A. 455, 459 (Sup. Ct. 1937).
On principle, we conclude that the interests of a changing, complex and technologically mushrooming society call for the application of the "reasonable use" doctrine in this field; a rule which enables judicial arbitration, in the absence of controlling legislation, of the fair participation in common waters of those who have a right of property therein on the basis of what all of the attendant circumstances *81 shows to be reasonable. On analysis of the case authorities, we think the courts have actually moved along that course, whatever the occasional ideological conflict in expression. This, moreover, is the approach recently taken by our Supreme Court in the closely cognate area of diversion of surface waters. Armstrong v. Francis Corp., 20 N.J. 320 (1956). The court there alluded to the consideration as to "whether the utility of the possessor's use of his land outweighs the gravity of the harm which results from his alteration of the flow of surface waters" (20 N.J., at page 330). It further said (20 N.J., at page 330):
"Social progress and the common wellbeing are in actuality better served by a just and right balancing of the competing interests according to the general principles of fairness and common sense which attend the application of the rule of reason."

V.
It remains to apply the foregoing principles to the special problem presented here. We have already taken notice of the plea of plaintiff that the effluent flowing into the ditch and pond is "noisome" and necessarily a pollutant because its origin in association with human excreta and secreta engenders such revulsion in the average person as assertedly must substantially impair the use of the pond as an important part of the public recreational and park area. The synthesis of the evidence set out in II, supra, cannot help but lead to the fair conclusion that the effluent is not reasonably to be regarded as a threat to health, nor offensive, now or in fair prospect, to the senses of sight or smell. No user of the park not knowing of the discharge of the effluent is ever apt to suffer lessened enjoyment ascribable to its flow. Indeed the contrary may be true in times of drought. As recognized by trial court and counsel the question is substantially one of psychological impairment of the recreational function of the park.
We by no means make light of plaintiff's grievance. The problem presented has impressed us as of considerable *82 import. As conceded by the trial court the people of Westville cannot be expected to be happy over the continuous presence of sewage effluent in their park pond, no matter how relatively pure. However, as will be more particularly developed presently, it cannot be said that the discharge of treated sewage effluent into a running stream is per se an unreasonable riparian use in today's civilization. Under the reasonable use approach we are called upon to counterweigh social uses and harms. And this we must do in a realistic rather than a theoretical way, and on the basis of the evidence of record, rather than on emotion or runaway imagination.
At the time of the trial the plant had been in operation almost five months. Only two citizens of Westville testified as witnesses, one the borough clerk and the other the borough attorney. Neither gave any evidence of actually lessened use or enjoyment of the park by the citizenry in a recreational sense. We recognize, of course, that the five-month period did not include the summer months, when the height of recreational use is reached. We entertain no doubt that an actual impairment of the use of the pond for psychological reasons associated with defendants' operations would call for serious consideration by the court. But we cannot deal with a different record than that before us. The "`state of a man's mind is as much a fact as the state of his digestion.'" Rubenstein v. Rubenstein, 20 N.J. 359, 368 (1956). We cannot assume, without evidence to the contrary, that, whatever the extent of public knowledge in Westville of the existence of the effluent, a pond and ditch not sensibly different in any apparent respect from what it has always been will not constitute substantially the same setting for park and recreational purposes that it has in the past. Initial public revulsion, if present, may or may not give way to acceptance of a situation which eventualities prove to involve no unpleasantness or actual harm. On the contrary, unpleasantness or harm may arise. Only time can tell. Cf. Lees v. Sampson Land Co., 372 Pa. 126, 92 A.2d 692, 694 (Sup. Ct. 1952). It is of interest that plaintiff's witness, Boyd, *83 who testified that the flow of effluent was not beneficial to the pond because of the "negative psychological effect," also testified to a situation at Medford (Burlington County) that "might approach" the instant one, where the sewage effluent from a treatment plant discharged into waters used for boating, swimming and fishing. Boyd's firm built the plant in 1939 and are still consulting engineers in its operation. He did not give any indication that the recreational use of the waters had been impaired.
On the other scale of the balance, we find the defendant sewerage company, certificated as a public utility pursuant to legislation, serving a function plainly essential to the public health, and by an instrumentality expressly approved, both as to plant and outlet, by the State Board of Health, pursuant to R.S. 58:12-3. That provision expressly requires Department approval of any sewage treatment plant "from which the effluent is to flow into any of such waters" ("any of the waters of this state"). It is common knowledge that effluent from a sewage treatment plant must have an outlet in running waters. It is significant that R.S. 58:10-5, which prohibits the discharge into any fresh water (defined as water which may be used for human consumption) of sewage, excremental matter, domestic refuse or other polluting matter, expressly excepts from its proscription the "effluent or other matter" discharged from a sewage disposal or treatment plant approved by the State Department of Health. Moreover, R.S. 58:10-10 deals with the regulation and approval by the Department of sewage disposal or treatment plants whose effluent is discharged into "any of the potable waters of this state." Each of these enactments gives the Department the right to bring legal action for penalties and injunction to enforce its control.
These acts of legislation, and others (see, e.g., N.J.S.A. 58:12-2), denote a public policy which recognizes the social importance of sewage disposal plants and the necessity of fair and reasonable accommodation to their functioning of the use of the waters of the State for other purposes, even including that of human consumption, a use *84 not involved in the present case. They tend to refute the idea that treated sewage effluent, as claimed by plaintiff, is necessarily a polluting or contaminating agent. See State Board of Health v. Borough of Vineland, supra (72 N.J. Eq., at page 864).
Clearly inapposite is the body of law that the influx of raw sewage which pollutes a stream is an actionable invasion (in the absence of legislative authorization) of the rights of a lower riparian owner. 93 C.J.S., Waters, § 45, p. 690; see Beach v. Sterling Iron & Zinc Co., supra (54 N.J. Eq., at page 76); or that a sewage disposal or treatment plant which, because of malfunctioning, inefficiency, or otherwise, is in fact a nuisance or a source of pollution, may be enjoined, Annotation, 40 A.L.R.2d 1177; Harrisonville v. W.S. Dickey Clay Mfg. Co., 289 U.S. 334, 53 S.Ct. 602, 77 L.Ed. 1208 (1933). Research discloses and counsel have cited no case wherein treated sewage effluent has been held per se an enjoinable water pollutant. The authorities are uniformly to the contrary. People v. City of Reedley, 66 Cal. App. 409, 226 P. 408 (D.C. App. 1924); Stovern v. Town of Calmar, 207 Iowa 1126, 224 N.W. 26 (Sup. Ct. 1929); Vickers v. City of Durham, 132 N.C. 880, 44 S.E. 685 (Sup. Ct. 1903).
Some of the testimony at the trial had to do with the failure of the State Department of Health to hold a public hearing before approving the defendant's plant. There was testimony that an official of the Department told representatives of plaintiff that it could have a hearing but that he implied "it would be useless." The action of the Department is not under review in this case, and we can indulge no assumption that it would not or did not exercise its responsibilities in the manner required by law. In any event, mere approval by a state administrative agency would not, in our judgment, preclude judicial relief to a riparian owner where otherwise indicated by circumstances calling for invocation of the principles discussed above. We do not read State Board of Health v. Borough of Vineland, supra, as to the contrary.
*85 Plaintiffs stress that defendants have an alternative method of disposal of the effluent by piping it directly to Big Timber Creek, at a cost of $15,000 to $20,000. There is no direct evidence in the present record concerning the cost or practicability of such a measure. For purposes of our conclusion, however, we have considered it to be a potential alternative and have weighed it in the balance of all the other considerations. We have also considered the comparative volume of the stream and effluent, so far as ascertainable from the evidence.
On the basis of the entire case we cannot conclude that the denial of injunctive relief by the trial court was erroneous. We do not rest our conclusion on the premise, which plaintiff has properly been at pains to dissipate, that there is required a showing of any particular kind of damages or injury other than psychological where there has, indeed, been the invasion of a property right. See Holsman v. Boiling Spring Bleaching Co., supra (14 N.J. Eq., at pages 342, 343). Our conception is, rather, that a determination as to the existence of an actionable invasion of the unquestionable property right of a riparian owner in the flow of a water course depends upon a weighing of the reasonableness, under all the circumstances, of the use being made by the defendant and of the materiality of the harm, if any, found to be visited by such use upon the reasonable uses of the water by the complaining owner. For all of the reasons we have set out, we do not consider that the balance of uses and harms reflected by this record points to an injunction. We trust that what we have said will not be read in anywise to impugn the appropriateness of plaintiff's use of the ditch and pond for recreational and park purposes as a riparian owner. If defendants' future operation of the treatment plant is ever shown to be such, in fact, as unreasonably to affect the use and enjoyment by the people of Westville of their park and pond, nothing herein determined upon the basis of the present record will, of course, preclude appropriate relief.
Judgment affirmed.